# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| JACKSON MILLER, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> DELOITTE SERVICES LP, ) <br> ) <br> Defendant. ) <br> ) <br> ) | Case No. 3:18-cv-00581 <br> Judge Aleta A. Trauger |

## REDACTED MEMORANDUM & ORDER

Before the court is the plaintiff's sealed Motion to Set Attorneys' Fees (Doc. No. 37). The defendant does not oppose the motion, because the parties have already reached a confidential settlement; the fees will be deducted from the already agreed-upon settlement amount to be paid by the defendant and will not affect its liability. Counsel for the plaintiff submits that court approval of the attorney's fee is required in light of the plaintiff's intellectual disability and lack of capacity to contract.

**I.  Background**

This action was filed in June 2018 by and through the plaintiff's "next friend," Wanda Padgett, against Deloitte Services LP ("Deloitte"), asserting claims under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.* The plaintiff, who is approximately 32 years old, has an IQ of 54, suffers from life-long health and developmental problems, and is unable to live independently. There is no dispute that he is intellectually disabled and lacks the capacity to contract.

In response to Deloitte's first Motion to Dismiss, filed in August 2018, the plaintiff filed an Amended Complaint. (Doc. No. 15.) The Amended Complaint asserts claims based on (1) the plaintiff's entitlement to recover plan benefits and to enforce rights under an ERISA plan, pursuant to 29 U.S.C. § 1132(a)(1)(B), and (2) breach of fiduciary duty under § 1132(a)(3), based on allegations that Deloitte had lost, misplaced or deleted a Designation of Beneficiary Form identifying the plaintiff as the beneficiary of a life insurance policy issued to his now-deceased father, who had been employed by Deloitte. The Amended Complaint also seeks attorney's fees under § 1132(g)(1). A separate count of the Amended Complaint seeks the appointment of a guardian ad litem for the plaintiff under Rule 17(c) of the Federal Rules of Civil Procedure or, alternatively, to "allow this action to play out" and "require[e] the appointment of a fiduciary upon any judgment or settlement, with the Court retaining jurisdiction to approve any settlement on behalf of the incompetent Plaintiff." (Doc. No. 15 ¶ 101.)

Deloitte promptly filed a Motion to Dismiss the Amended Complaint. The court denied the second motion in January 2019, rejecting the defendant's arguments that the Amended Complaint failed to state a claim for which relief may be granted and that any claims adequately stated were barred by the statute of limitations or failure to exhaust.

Shortly thereafter, the court granted the plaintiff's motion under Rule 17(c)(2) of the Federal Rules of Civil Procedure for the appointment of a guardian ad litem to protect the plaintiff's interests. (Doc. No. 34.) On May 24, 2019, the parties filed a Sealed Joint Motion for Approval of Settlement, indicating they had reached a settlement as to all issues raised in this litigation. The court granted that motion. The Settlement Agreement specifically contemplates that ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ (Doc. No. 36-1 ¶ 3.)[1]

The total settlement amount is $▬▬▬▬▬▬. Plaintiff's counsel requests an attorney's fee in the amount of $▬▬▬▬, plus prepaid costs and expenses in the amount of $29,606.95, most of which ($27,819.68) are for fees paid to a law firm in Michigan for its efforts to enforce a $500,000 judgment that plaintiff's counsel obtained in a separate action in state court in January 2017. Counsel represents that they successfully negotiated with the Michigan law firm to reduce the fee demanded from $37,198.61 to $27,819.68. Based on these figures, the total sum payable to the plaintiff, after the deduction of fees and costs, would be $▬▬▬▬▬▬.[2] A fee of $▬▬▬▬ is equivalent to 35% of the settlement amount.

In his motion, the lead attorney for the plaintiff represents that he began working on this case in January 2016 and that the matter has generally been protracted and complicated—involving a state court case in Tennessee to impose a constructive trust on the proceeds of the plaintiff's father's life insurance, attempts to enforce the judgment in that case in Michigan, and ultimately the filing of the ERISA lawsuit in this court. This case was only made possible by plaintiff's counsel's discovery, while litigating a Rule 60 motion filed in the state court case, of a partial beneficiary designation form dated January 2007. The attorney also represents that, at the time he took the case in January 2016, multiple attorneys had already recommended not pursuing the case and that the maximum recovery possible appeared to be $500,000, based on the divorce decree between the plaintiff's parents, requiring his father to maintain life insurance for the

---

[1] Although the guardian ad litem submitted an affidavit in support of the settlement agreement (Doc. No. 36-3), she has not weighed in on the question of the reasonableness of the attorney's fee sought by plaintiff's counsel, even though "a challenge to attorney's fees is well within the duties of a guardian ad litem." *Wright v. Wright*, No. M2007-00378-COA-R3CV, 2007 WL 4340871, at *3 (Tenn. Ct. App. Dec. 12, 2007) (citations omitted).

[2] This figure does not include fees that will be payable to the guardian ad litem.

plaintiff's benefit in the amount of $500,000.

Counsel represents that he had plaintiff "sign or otherwise agree to retention agreements with [his] law firm." (Doc. No. 38-1 ¶ 27.) Although the retention agreement with counsel's firm contains a contingency provision (Doc. No. 38-9, at 2), counsel represents that "the point of [the agreement] was not to bind Plaintiff, but rather to evidence his approval of Counsel's proceeding with actions to recover the funds" sought in this case (Doc. No. 38-1 ¶ 27). In other words, counsel understood that the plaintiff, in light of his low IQ and overall level of functioning, likely lacked the capacity to enter into a contingency fee agreement.

The law firm's records reflect that lead counsel devoted over 370 billable hours to this matter, and the law firm as a whole billed over 500 hours. While lead counsel's ordinary billable rate is from $▮ to $▮ per hour, depending on the client and the subject matter of the representation (*id.* ¶ 23), the amount of fees sought represents an effective average hourly rate of approximately $▮ or roughly ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. The supervising partner on the case represents that his law firm "routinely engages clients in matters similar to this case at a contingency rate ranging between 33 and 40%, plus any advanced costs." (Doc. No. 38-8 ¶ 4.) The "Prebill" records submitted by counsel reflect a total of 537.60 billable hours worked, at various billing rates. This number of hours multiplied by the billing attorneys' customary rates would result in a total fee of $▮. (*See* Doc. No. 38-1 Ex. C.)

## II. Legal Standards

The plaintiff does not appear to seek an award of attorney's fees under ERISA's fee-shifting provision, *per se*. Rather, it appears that plaintiff's attorneys are entitled to be paid for their work on this case based on their retention agreement with the plaintiff, and the underlying

settlement agreement specifically contemplates that an attorney's fee will be deducted from the total settlement amount. That is, plaintiff's attorneys are intended third-party beneficiaries of the settlement agreement. In addition, because of the plaintiff's status as a disabled person and his lack of capacity to contract, plaintiff's counsel presumes that the court's approval of both the settlement agreement and the amount of the attorney's fee to be deducted from the settlement amount is required and that Tennessee law governs the determination of whether the amount of the fee is reasonable. The defendant does not dispute that assumption, and the court, too, presumes without analysis that the plaintiff's request is governed by Tennessee law.

Under Tennessee statute, the court has the power to approve a settlement made on behalf of a mentally disabled person, so long as it is in the disabled person's best interest, Tenn. Code Ann. § 34-1-121(b), and to approve the payment of any attorney's fee the court determines to be "necessary," *id.* § 34-1-113(a). Moreover, any attorney's fee in Tennessee must be "reasonable." Tenn. Sup. Ct. R. 8, RPC 1.5. The court's determination of reasonableness

> is a subjective judgment based on evidence and the experience of the trier of facts, and Tennessee has no fixed mathematical rule for determining what a reasonable fee is. Accordingly, a determination of attorney's fees is within the discretion of the trial court and will be upheld unless the trial court abuses its discretion.

*Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011) (internal quotation marks and citations omitted).

While the Tennessee Supreme Court has not expressly addressed what factors are to guide the consideration of the "reasonableness" of an attorney's fee in cases involving mentally disabled adults, it has addressed "the proper method for computing a reasonable attorney's fee when the attorney represents a minor." *Wright*, 337 S.W.3d at 169. When an attorney represents a minor, courts should determine a "reasonable" attorney's fee by referencing Rule 1.5 of the Tennessee Rules of Professional Conduct, which also addresses the determination of reasonable

fees when the client is an adult. These factors include the following:

> (1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
>
> (2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
>
> (3) The fee customarily charged in the locality for similar legal services;
>
> (4) The amount involved and the results obtained;
>
> (5) The time limitations imposed by the client or by the circumstances;
>
> (6) The nature and length of the professional relationship with the client;
>
> (7) The experience, reputation, and ability of the lawyer or lawyers performing the services;
>
> (8) Whether the fee is fixed or contingent;
>
> (9) Prior advertisements or statements by the lawyer with respect to the fees the lawyer charges; and
>
> (10) Whether the fee agreement is in writing.

*Wright*, 337 S.W.3d at 176–77 (quoting Tenn. Sup. Ct. R. 8, RPC 1.5(a)). The factors "are not exclusive and each factor may not be relevant in every case." *Id.* at 177 n.17 (citing RPC 1.5 cmt. [1]).

While the court in *Wright* declined to emphasize any particular factor or require additional factors when the case involves a minor, the court did note that courts "should be mindful of their particular responsibility to protect [a] minor's best interests." *Id.* at 189. In particular, when attorney's fees are to be paid out of a plaintiff's recovery:

> [t]he Court has a responsibility in such a case to oversee the fairness of the fee in a more general sense. This is especially true when the plaintiffs are minors and are hence in no position to judge for themselves the value of the services rendered by their attorneys or to protect fully their own interests and needs in the division of a settlement award negotiated on their behalf. . . . These concerns also require the court to give special scrutiny to the claim for attorney fees. In this situation,

> the Court must consider not only the fair value of the services rendered by plaintiffs' counsel, but also the needs, both present and future, of the [minor] plaintiffs who are the Court's special responsibility.

*Id.* at 178–79 (quoting *Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 567 F. Supp. 790, 812–13 (D.D.C. 1983)).

Plaintiff's counsel in this case presumes that the same factors and concerns apply to situations in which an attorney represents a mentally disabled adult; that presumption is borne out by *Wright* itself and, indeed, by the Tennessee statute imposing the same duty on courts to consider the best interest of both minors and persons with a disability. *See Wright*, 337 S.W.3d at 179 (quoting Tenn. Code Ann. § 34-1-121(b)).

In addressing a motion for attorney's fees by counsel for a mentally disabled client, the court "should develop an evidentiary record, make findings concerning each of the factors, and then determine a reasonable fee that depend[s] upon the particular circumstances of the individual case." *Id.* at 185–86 (internal quotation marks and citation omitted).

### III. Discussion

#### A. The Rule 1.5 Factors

##### *(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly*

Charles Michels was the primary billing attorney on this case. He devoted a substantial number of hours to the matter—almost 400 as of May 14, 2019—over the course of three and a half years, beginning in January 2016. (C. Michels Aff., Doc. No. 38-1.) Other billing professionals billed lesser amounts, but the time and labor devoted to this case was clearly substantial, even though only a small part of it actually involved litigating in this court against Deloitte. Specifically, counsel did not discover until February 2018 that there was a potential basis for bringing an ERISA action against Deloitte in federal court. (*Id.* ¶¶ 12–16.)

The questions presented were not particularly novel—the difficulty in the case arose from the need to have pursued different claims against different defendants in different courts and venues in order to attempt to recover funds to which the plaintiff was entitled. It is clear, however, that counsel persevered when other attorneys recommended not pursuing the case further in light of the small likelihood of success and the potential difficulty in collection on a judgment if one were obtained.

*(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer*

The client himself would have had no awareness that the acceptance of this particular employment would have precluded other employment by the lawyer, but the court considers this factor anyway, in the interest of a complete record.

Mr. Michels offers no actual evidence regarding the question of whether this matter precluded other employment, but he attests that, since taking the case, he has billed approximately 2,400 hours per year, an average of 9.23 billable hours per non-holiday workday. In October 2018, the month in which the plaintiff received and responded to Deloitte's second Motion to Dismiss, counsel billed 284 hours, which entailed working from home on nights and weekends. These astoundingly large numbers suggest that the attorney had as much work as he could handle and likely would have worked on other, potentially less risky cases had this one not come along.

*(3) The fee customarily charged in the locality for similar legal services*

L. Gino Marchetti, Jr. is the managing partner for Taylor, Pigue, Marchetti, & Blair PLLC ("TPMBLaw"), the law firm engaged in representing the plaintiff, and a lawyer who has been practicing since 1977. According to Marchetti, he is aware that other firms in Nashville generally handle cases such as this one at a contingency rate ranging from 33 to 40%, plus costs,

and TPMBLaw itself routinely engages clients in similar matters at a contingency rate ranging from 33 to 40%, plus costs. (Doc. No. 38-8 ¶¶ 4–5.)

Marchetti also states that the hourly rates submitted by plaintiff's counsel are within the range of rates generally charged both by his firm and by other Nashville-area law firms in non-contingency matters. These rates are $▮ for himself, $▮ for partner Keith Blair, $▮ for Charles Michels (who, at this point, has been practicing for almost seven years), $▮ for other associates, and $▮ for paralegals. (*Id.* ¶¶ 5–6.)

### *(4) The amount involved and the results obtained*

Plaintiff's counsel believed at the outset that the maximum value of this case was $500,000, the amount of life insurance the plaintiff's father was supposed to carry for the plaintiff's benefit under the terms of the plaintiff's parents' divorce decree. The ultimate settlement for over $▮▮▮▮, which effectively represents ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, is a markedly good result.

### *(5) The time limitations imposed by the client or by the circumstances*

This factor does not appear to be relevant in this case.

### *(6) The nature and length of the professional relationship with the client*

The relationship with the client began in January 2016. Charles Michels essentially took over the file, along with approximately thirty others, from another local law firm that was reorganizing. It does not appear that counsel took on the case as an affirmative decision, weighing the amount of work it would require against the likelihood of success. This is the only matter plaintiff's counsel has handled for the plaintiff.

Michels attests that, upon his initial review of the plaintiff's file and contrary to the recommendations of plaintiff's former counsel, he believed it likely that the Williamson County

Chancery Court, which issued the 2005 divorce decree, had ongoing jurisdiction to enforce the decree and would likely impose a constructive trust on the plaintiff's father's widow in the amount of the life insurance proceeds she received that should have gone to the plaintiff. (Doc. No. 38-1 ¶ 8.) Counsel, in fact, obtained a $500,000 judgment in 2017 against plaintiff's father's widow. Counsel then ascertained that, although the widow had spent most of the insurance proceeds within a year of receiving the payment, she owned real estate worth $200,000 that could be attached to satisfy the judgment in part. He retained local counsel in Michigan to begin assisting with that process. However, in the course of responding to the widow's Rule 60.02 motion to set aside the Tennessee judgment in late 2017, counsel asked for additional documentation from the plaintiff's next friend, Wanda Padgett, which resulted in counsel's discovery, in early 2018, of the document that led to the filing of this lawsuit.

By its nature, the case has required counsel to pursue litigation in both Tennessee state and federal court, to retain local counsel in Michigan, and, once it became clear that Deloitte would settle, to seek the appointment of a guardian ad litem to protect the plaintiff's interest in the settlement proceeds.

> *(7) **The experience, reputation, and ability of the lawyer or lawyers performing the services***

While Michels was supervised by a more senior attorney (*see* G. Marchetti, Jr., Aff., Doc. No. 38-8 ¶ 7), he performed most of the work in this case. Michels had been practicing law for only three and a half years when he began working on this case. (Doc. No. 38-1 ¶¶ 2, 4.) He has now been practicing for almost seven years, but it is reasonably likely that he worked less efficiently than a more experienced attorney would have. Gino Marchetti attests that he has provided minimal oversight in this case, that he frequently entrusts to Michels "complex and non-routine case files, providing oversight as necessary," and that Michels has "successfully

acted as lead counsel in a handful of similarly valued matters." (Doc. No. 38-8 ¶¶ 11–12.) There is no evidence in the record to support a conclusion that this matter was highly valued at the time Michels began working on it, and there is no further evidence in the record regarding his experience, reputation, and ability.

### *(8) Whether the fee is fixed or contingent*

Michels attests that, although he had the plaintiff sign or otherwise agree to retention agreements with his firm and with Michigan counsel, the purpose of doing so was to document that the mentally disabled plaintiff was aware of, and approved, counsel's efforts to recover money on his behalf. (Doc. No. 38-1 ¶ 27.) Michels was aware from the outset that any settlement and any attorney's fees would have to be approved by the court. (*Id.* ¶ 28.)

In light of the unenforceability of any contingency fee agreement, the fact that the plaintiff signed such an agreement is entitled to no weight. *See Wright*, 337 S.W.3d at 183. However, for purposes of the reasonableness computation, it is relevant that plaintiff's firm and other law firms in the area routinely undertake cases such as this one on a contingency fee basis, with the fee ranging from 33% to 40% of the total recovery, depending upon the stage at which a favorable recovery is reached. "The trial court may . . . consider that, in actions that attorneys accept on contingency, the fee should ordinarily be greater than in cases where the fee is fixed." *Id.* at 183.

A portion of the prepaid "costs" sought by counsel includes attorney's fees in a fixed amount that have already been paid to the Michigan law firm. To their credit, plaintiff's counsel negotiated the fee sought by that firm down from $37,198.61 to $27,819.68.

### *(9) Prior advertisements or statements by the lawyer with respect to the fees the lawyer charges*

There is no evidence in the record regarding this factor.

### *(10) Whether the fee agreement is in writing*

This factor, like the eighth, is of no import in light of the plaintiff's disabled status.

**B.     Overall Reasonableness**

Considered together, only two of the above factors weigh strongly in favor of a fee above the lodestar amount[3]: (1) the excellent result achieved by plaintiff's counsel on behalf of the disabled plaintiff, and (2) the fact that this type of case, according to the plaintiff's attorneys, is typically undertaken on a contingency basis. With regard to the latter, however, the court must consider whether and to what extent the plaintiff's attorneys actually undertook a risk of non-recovery. The failure to consider such a risk could result in an unreasonably low award of the type "that might soon dissuade attorneys from accepting the representation" of disabled persons. *See Wright*, 337 S.W.3d at 183. That is, the court must consider "the actual risks present in a given case before deciding whether and how much more or less an attorney should receive in a case where a contingent fee would customarily be charged." *Id.* at 185. At the same time, the court must have "regard for the [disabled plaintiff's] present and future needs" in analyzing the relevant factors in a particular case. *Id.*

In this particular case, it appears that the law firm took over the case, along with thirty other matters, from another law firm that was reorganizing, without particular attention to the risk of non-recovery posed by this particular case. The file was assigned to a mid-level associate with, at the time, just three years of experience. Moreover, according to counsel, he believed from the outset that the likelihood of a favorable judgment in the state court was relatively high, despite having been advised by other attorneys that the case should be abandoned. Thus, while

---

[3] A lodestar calculation requires to the court to "multipl[y] the number of hours that the attorney has reasonably expended on the case times a reasonable or customary hourly rate." *Wright*, 337 S.W.3d at 179.

the law firm undoubtedly took a risk, it initially took on the case without regard to the risk, which then appeared, upon assessment, to be relatively small. In addition, plaintiff's counsel anticipated at the outset of the representation that maximum potential recovery in the case was $500,000, with no additional allowance for an attorney's fee. The ability to bring an ERISA case in this court, and the relative likelihood of the success of such a case, was not a glimmer in anyone's eye at the outset of this case.

In addition, whatever risk was consciously assumed by the plaintiff's lawyers, this was not a personal injury case in which the amount of the potential recovery was subject largely to the whim of a jury. Rather, the potential damages amount appeared to be a concrete maximum. In light of that maximum, even assuming a contingency fee at the highest possible rate of 40%, the largest fee counsel could reasonably have expected at the outset of the litigation would have been $200,000. The fact that a document emerged suggesting the possibility of an ERISA recovery and the attendant possibility of also recovering an attorney's fee was purely a windfall that did not factor into the decision whether to take the case at the outset.

Although plaintiff's counsel undoubtedly worked very hard and is to be commended for his perseverance, creativity, and skill, other factors weigh against the amount of the recovery sought in this case, principally counsel's youth and inexperience at the outset of the case and the fact that the belated discovery of the document that ultimately led to filing of this suit and the present settlement amounted, basically, to a fortuitous windfall.

In light of all these factors, weighed and considered in conjunction with the fact that the plaintiff is a disabled individual, the court finds that a fee above the lodestar amount is warranted, but not in the amount sought by plaintiff's counsel. As set forth above, plaintiff's attorneys seek $███████, equivalent to 35% of the settlement amount and ████████████ what

the fee would be based on the billing attorneys' customary rates, an average of $█████ per hour, multiplied by 537.60 hours, or $█████.

Based on all of the circumstances presented here, as discussed above, the court finds that a fee of $█████ would be reasonable. In particular, the court takes into account the positive result achieved by plaintiff's counsel, the significant number of hours worked over the course of more than three years, and the fact that the law firm took on the case, despite a risk of non-payment. The court finds that a contingency fee in the amount of $█████ would be unreasonably high in light of the fact that the law firm essentially took on the case without regard to the risk, assigned the vast majority of the work to a relatively inexperienced associate, and the actual settlement figure amounted to something of a windfall that no one anticipated at the outset of the litigation. A fee in the amount of $█████ equates to an average hourly rate of approximately $█████ multiplied by 537.60 hours, substantially higher than the actual average hourly rate of the professionals who worked on this file. It is also equivalent to almost 28% of the total recovery amount and is well in excess of █% of the highest possible recovery anticipated when counsel began working on the case.

## IV. Conclusion and Order

The plaintiff's sealed Motion to Set Attorneys' Fees (Doc. No. 37) is **GRANTED** and plaintiff's counsel is hereby awarded a fee of $█████, plus prepaid costs and expenses in the amount of $29,606.95, $27,819.68 of which is for fees already paid to the Michigan law firm. The amount payable to the plaintiff from the settlement amount will be $█████, minus any fee payable to the guardian ad litem.

It is so **ORDERED**.

This the 14TH day of June, 2019.

                                                  ALETA A. TRAUGER
                                                  United States District Judge